IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WILDEARTH GUARDIANS,

    Plaintiff,

vs.                                                   No. CV 14-0666 RB/SCY

UNITED STATES
ARMY CORPS OF ENGINEERS,

    Federal Defendant,

MIDDLE RIO GRANDE
CONSERVANCY DISTRICT,

    Defendant-Intervenor.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff WildEarth Guardians' Motion and Memorandum in Support of Amended Motion to Complete and/or Supplement the Administrative Record Lodged by Federal Defendant United States Army Corps of Engineers, filed on March 1, 2017. (Doc. 97.) WildEarth Guardians seeks to add documents to the administrative record compiled by Defendant U.S. Army Corps of Engineers. The Court has considered the arguments of the parties, the relevant law, the extra-record documents, and the administrative record. With the exception of the documents the Corps has agreed to include in the administrative record and the RPA Compliance Reports for the years 2003–06, 2011, and 2014, the Court **DENIES** WildEarth Guardians' motion.

## I. BACKGROUND

### a. *Legal Background*

Recognizing that species of fish, wildlife, and plants in the United States have aesthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people, Congress created the Endangered Species Act (ESA) to protect at-risk species. *See* 16 U.S.C. § 1531(a).

Pursuant to the ESA, the Secretary of the United States Fish and Wildlife Service (FWS) publishes a list of endangered or threatened species and lists their critical habitats. *See* 16 U.S.C. § 1533(c). Federal agencies have a substantive duty under Section 7(a)(2) of the ESA to ensure that their actions do not "jeopardize the continued existence" of or harm any listed species or their critical habitat. *See* 16 U.S.C. § 1536(a)(2). To ensure that federal agencies uphold their substantive duty, Section 7(a)(2) also has procedural requirements: all federal agencies considering projects that may adversely affect a listed species or its critical habitat must engage in formal consultation with the FWS. *Id.*

The Section 7(a)(2) formal consultation process begins when the agency issues a written request for the initiation of formal consultation to the FWS. 16 U.S.C. § 1536(c); 50 C.F.R. § 402.14(c). This written request includes the agency's Biological Assessment, in which the agency identifies the action it proposes to implement and evaluates the expected impact of the proposed action on listed species and their critical habitats. 16 U.S.C. § 1536(c); 50 C.F.R. §§ 402.12, 402.14. At the end of the Section 7(a)(2) formal consultation process, the FWS issues a Biological Opinion, which includes the FWS's determination of whether the proposed agency action comports with the agency's substantive duties under Section 7(a)(2). 50 C.F.R. § 402.14(h). If the FWS finds that a proposed agency action will jeopardize a listed species or

adversely affect a critical habitat, the FWS includes a "Reasonable and Prudent Alternative" (RPA) that avoids the adverse effect in the Biological Opinion. *Id.*

In addition to Section 7(a)(2)'s procedural and substantive protections, listed species also enjoy protection from Section 9 of the ESA, which prohibits any person, including any federal agency, from "taking" a listed species. 16 U.S.C. § 1538(a)(1). The ESA defines "take" as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." 16 U.S.C. § 1532(19). Not all taking is prohibited, however. If the FWS finds that implementation of the action that is the subject of a Biological Report will result in incidental taking of a listed species, the FWS may incorporate an Incidental Take Statement into the Biological Opinion. 16 U.S.C. § 1536(b)(4). Any taking covered by the scope of the Incidental Take Statement is not considered to be prohibited. *See* 16 U.S.C. § 1536(o)(2).

Under the ESA's "citizen-suit" provision, any person—including any organization—may commence a civil suit to enjoin an agency from affirmatively violating the ESA, *see* 16 U.S.C. § 1540(g)(1)(A), and against the Secretary for an alleged failure to perform any nondiscretionary duty that the ESA requires, *see* 16 U.S.C. § 1540(g)(1)(C).

### b. *Factual and Procedural Background*

Plaintiff WildEarth Guardians is a non-profit environmental advocacy and conservation organization based in Santa Fe, New Mexico. (Doc. 66 at 4.) As part of its "Rio Grande: America's Great River" campaign, WildEarth Guardians seeks to protect and restore the Rio Grande by ensuring that the river has continuous flows and that the river continues to support its native species. (*See id.*) WildEarth Guardians' efforts to protect the Rio Grande's native species include attempts to ensure the survival and recovery of the Rio Grande silvery minnow and the southwestern willow flycatcher.

The Rio Grande silvery minnow was historically one of the most abundant species of fish in the Rio Grande watershed system, occurring from Espanola, New Mexico, to the Gulf of Mexico. *See* Final Rule to List the Rio Grande Silvery Minnow as an Endangered Species, 59 Fed. Reg. 36,988 (July 20, 1994). By 1994, however, the Rio Grande silvery minnow was only found in the Middle Rio Grande, from Cochiti Dam downstream to the headwaters of Elephant Butte Reservoir, New Mexico, or about five percent of the minnow's historic range. *Id.* According to the FWS, threats to the minnow include dewatering; channelization and regulation of river flow to provide water for irrigation; diminished water quality caused by municipal, industrial, and agricultural discharges; and competition with non-native fish species. *Id.* On July 20, 1994, the FWS listed the Rio Grande silvery minnow as endangered under the ESA. *Id.*

The southwestern willow flycatcher is a small bird, approximately 15 cm long, that breeds in several southwestern states, including New Mexico. *See* Final Rule Determining Endangered Status for the Southwestern Willow Flycatcher, 60 Fed. Reg. 10,694 (Feb. 27, 1995). Within the Southwest, the flycatcher is restricted to dense riparian associations of willow, cottonwood, buttonbush, and other deciduous shrubs and trees. *Id.* This habitat, already historically rare, is becoming even more scarce due to brood parasitism and lack of protective regulations. *Id.* In 1995, the FWS listed the southwestern willow flycatcher as endangered under the ESA. *Id.*

On June 16, 2015, WildEarth Guardians filed its Third Amended Complaint pursuant to the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g), against the U.S. Army Corps of Engineers and the U.S. Bureau of Reclamation, alleging that the Defendants' Middle Rio Grande operations violated the ESA with respect to the Rio Grande silvery minnow and the southwestern willow flycatcher. (Doc. 66 at 34–37.) The U.S. Army Corps of Engineers (Corps) is a federal

agency within the Department of the Army that maintains and operates the Abiquiu, Cochiti, Galisteo, and Jemez Canyon dams pursuant to the Middle Rio Grande Project. (Doc. 66 at 5–6.) The U.S. Bureau of Reclamation (Reclamation) is a federal agency within the Department of the Interior that manages water rights and diversion structures on the Middle Rio Grande. (Doc. 66 at 5.)

On March 1, 2017, WildEarth Guardians voluntarily dismissed all of its remaining claims against Reclamation. Presently, WildEarth Guardians has three remaining claims against the Corps: (1) WildEarth Guardians' "Fifth Claim for Relief," which alleges that the Corps' Middle Rio Grande operations violate the substantive provisions of Section 7(a)(2) by jeopardizing listed species and adversely affecting the species' critical habitats; (2) WildEarth Guardians' "Sixth Claim for Relief," which alleges that the Corps' decision to terminate consultation with the FWS regarding its Middle Rio Grande operations violates the procedural requirements of Section 7(a)(2); and (3) WildEarth Guardians' "Seventh Claim for Relief," which alleges that the Corps' Middle Rio Grande operations have caused and continue to cause incidental taking of Rio Grande silvery minnows, in violation of Section 9 of the ESA. (*See* Doc. 66 at 36–37.)

On December 1, 2015, the Corps compiled, certified, and lodged the Administrative Record (record). (Doc. 72.) WildEarth Guardians now asks the Court to add additional documents, totaling more than 4,300 pages, to the record.

## II. STANDARD

District courts process reviews of agency action as appeals. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994). Since the review is treated as an appeal, the Court is not an independent decision maker, and it must not substitute its judgment for that of the agency, even if it might have decided matters differently. *See Am. Mining Cong. v. Thomas*, 772

F.2d 617, 626 (10th Cir. 1985). As a result, the Court may not create its own record and make findings de novo, but must instead review agency action under the narrow and deferential arbitrary and capricious standard. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973). Under the arbitrary and capricious standard, a district court reviews an agency action to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Bar MK Ranches v. Yuetter*, 994 F.3d 735, 739 (10th Cir. 1993) (citing 5 U.S.C. § 706(2)(A)). The Court's review must be searching and careful, but the ultimate standard of review is a narrow one. *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1029–30 (10th Cir. 2001).

When conducting its arbitrary and capricious review, courts normally restrict their review to the record compiled by the agency. *Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't. of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007) (citing *Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004)). Though "an agency may not unilaterally determine what constitutes the Administrative Record," the agency's designation of the Administrative Record is entitled to a presumption of administrative regularity. *Bar MK Ranches*, 994 F.3d at 739–40. Only in "extremely limited circumstances" does a court consider evidence outside the administrative record. *Citizens For Alternatives*, 485 F.3d at 1096. For example, a court may supplement the record with additional evidence if "there is a strong showing of bad faith or improper behavior." *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).

In addition to bad faith or improper behavior, the Tenth Circuit has identified five exceptional situations where a court may supplement the record:

> (1) the agency action is not adequately explained and cannot be reviewed properly without considering the cited materials, (2) the record is deficient because the agency ignored relevant factors it should have considered in making its decision, (3) the agency considered factors that were left out of the formal record, (4) the

6

case is so complex and the record so unclear that the reviewing court needs more evidence to enable it to understand the issues, and (5) evidence coming into existence after the agency acted demonstrates that the actions were right or wrong.

See *Am. Mining Cong.*, 772 F.2d at 626 (internal citations omitted). Again, the *American Mining* Court cautioned that these exceptions "must be extremely limited," since review of an agency's action should be limited to the "evidence and proceedings before the agency at the time it acted." See *Am. Mining Cong.*, 772 F.2d at 626 (internal citations omitted).

The second *American Mining* exception—where the record is deficient because an agency ignored relevant factors it should have considered—deserves further comment. The dictionary definition of "relevant" is "bearing upon or properly applying to the matter at hand." *Relevant*, Webster's Third New International Dictionary (3rd ed. 1971). However, given that almost any document a plaintiff seeks to add to the administrative record could conceivably bear upon or properly apply to the matter litigated, a court must adopt a narrower definition of "relevant" to prevent the relevancy exception from swallowing the rule requiring a reviewing court to consider only the administrative record.

Indeed, the Tenth Circuit has treated this "relevancy" exception very narrowly. For example, in *Lee v. United States Air Force*, the parties disputed whether the Air Force was correct in deciding that its proposed action had minimal impact on land value. *See Lee*, 354 F.3d at 1241–42. The appellants sought to supplement the administrative record with the affidavit of a professional real estate appraiser, which they said would compel a conclusion contrary to that of the Air Force. *Id.* at 1242. Although the affidavit undoubtedly related to land value, the *Lee* Court, after reciting the relevancy exception, denied the appellants' request, noting that there were no "gaps or inadequacies . . . that would make the admission of extra-record evidence appropriate." *Id.* Seeking to preserve the administrative record rule and bearing in mind the

relevant precedent, the Court adopts a narrow reading of the relevancy exception and limits its application to situations where the proponent of an extra-record document shows by clear evidence that the document "should have" been considered, and that the "record is deficient" because that document was not considered. *See Am. Mining Cong.*, 772 F.2d at 626.

Unless the party seeking to supplement the record can prove by clear evidence that the documents sought to be added fit into one of the five exceptions discussed above, or that the agency acted in bad faith or improperly, the Court will assume that the agency adequately designated the record and will review only that record. *See Bar MK Ranches*, 994 F.3d at 740 ("The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary.").

### III. DISCUSSION

#### a. *Documents Related to WildEarth Guardians' Fifth Claim for Relief: that the Corps' operations in the Middle Rio Grande facilities violate the substantive provisions of Section 7(a)(2)*

WildEarth Guardians asks the Court to supplement the record with documents that relate to its Fifth Claim for Relief, which alleges that the Corps' operations in its Middle Rio Grande facilities violate the substantive provisions of Section 7(a)(2). These documents include Reasonable and Prudent Alternative (RPA) Compliance Reports for various years, (Doc. 97, Ex. 1, #49–61.); the January 22, 2007 letter from the Corps to the FWS regarding the San Marcial Railroad Bridge, (*id.* #64); the FWS's October 10, 2011 intra-agency memorandum, (*id.*, #65); and documents relating to the Corps' practice of deviating from normal operating criteria for the benefit of ESA-listed species, (*id.* #1–13, 36–39).[1] (Doc. 97 at 18–19.)

---

[1] WildEarth Guardians claims that the Corps has agreed to include Doc. 97, Ex. 1, #37 in the record. (Doc. 103, Ex. 3 at 7.) If true, the Court will not oppose its inclusion.

8

The Court first notes that the RPA Compliance Reports for the years 2003–06, 2011, and 2014 are already lodged with the Court as part of Reclamation's Administrative Record (Doc. 97 at 17), and the Corps does not oppose their continued inclusion in the record (Doc. 103 at 6). Thus, those documents will continue to be part of the record.

However, WildEarth Guardians does not explain how the remaining documents fit into one of the narrow exceptions that allow a court to defeat the presumption of adequacy for the record the Corps compiled. For example, WildEarth Guardians claims that the RPA Compliance reports are "the best evidence of the Corps' efforts to comply with its substantive obligation[s] under ESA Section 7(a)(2)," without which the Court would not be able to adjudicate the claim. (Doc. 97 at 18.) But WildEarth Guardians does not explain *why* the existing record is insufficient. Similarly, although WildEarth Guardians describes the contents of the letter from the Corps to the FWS regarding the San Marcial Railroad Bridge, it is not obvious which exception permits the Court to consider the letter. WildEarth Guardians bears the burden of presenting clear evidence to the Court as to how its extra-record materials fit within an exception. It cannot satisfy this burden by pointing to potentially helpful documents, making conclusory statements, and leaving the Court guessing as to whether the record is inadequate without those documents.

Keeping in mind that WildEarth Guardians bears the burden of establishing by clear evidence that the documents fit within one of the narrow exceptions to the presumption of administrative regularity, the Court declines to admit the documents pertaining to WildEarth Guardians' Fifth Claim for Relief.

### b. *Documents Related to WildEarth Guardians' Sixth Claim for Relief: that the Corps violated its procedural obligations under Section 7(a)(2) by ending its consultation with FWS regarding the impact of its Middle Rio Grande operations on listed species*

WildEarth Guardians also asks the Court to supplement the record with extra-record materials that relate to its Sixth Claim for Relief, which alleges that the Corps violated its procedural obligations under Section 7(a)(2) by terminating its consultation with the FWS regarding the impact of its Middle Rio Grande operations on listed species.

These materials include documents pertaining to the Corps' previous deviations for the benefit of ESA-listed species, (Doc. 97, Ex. 1, #1–13); documents explaining the Corps' approach to using "environmental flows," (*id.* #36–39); documents memorializing the Corps' agreements to exercise discretion to protect the silvery minnow and the flycatcher, (*id.* #34–35); documents criticizing the "Stockdale memo," which the Corps relied on in determining its ESA obligations, (*id.* #31–32); documents containing the FWS's analyses and conclusion that the Corps' operations in the Middle Rio Grande have a "high" adverse impact on ESA-listed species (*id.* #27–30); and part of a February 28, 2013 Biological Opinion by the FWS in which the FWS commemorates the Corps' commitment to consult with the FWS regarding the impact of the Corps' upstream dams and reservoirs on ESA-listed species, (*id.* #25). (Doc. 97 at 20–23.)

WildEarth Guardians argues that the first three sets of documents—pertaining to the Corps' previous deviations for the benefit of ESA-listed species, (Doc. 97, Ex. 1, #1–13); explaining the Corps' approach to using "environmental flows," (*id.* #36–39); and memorializing the Corps' agreements to exercise discretion to protect the silvery minnow and the flycatcher, (*id.* #34–35)—belie the Corps' claim that it has no authority to deviate from normal operations to help listed species. (*See* Doc. 97 at 20.) WildEarth Guardians contends that these documents should be admitted under the first two *American Mining* exceptions: (1)

that the Corps' position that it cannot implement operating deviations "is not adequately explained" and cannot be properly reviewed without considering the cited materials and (2) that the documents were "relevant factors" that the Corps should have considered. (*Id.*)

However, the record already contains the Corps' rationale for why it believes it now has less authority to deviate than before. (*See* USACE000002)[2] (explaining that the Corps' past view of its discretion was overly broad in light of intervening court decisions, and that the Corps' past view was based on an attempt to be over-inclusive at a time when it was less important to accurately define the Corps' role since at the time the Corps jointly performed consultations with Reclamation). What's more, the record shows that the Corps already understands that its new position regarding its discretion deviates "significantly" from past Corps positions. (*See id.*)

Given what is already in the record, it is unclear what new information WildEarth Guardian' documents bring such that the record would be deficient without them. For example, WildEarth Guardians maintains that the documents pertaining to environmental flows explain that the Corps can deviate even absent explicit Congressional authorization, thus illustrating the "significant latitude" the Corps has in choosing whether to deviate. (Doc. 97 at 21.) However, the document adds nothing new since the Corps has already acknowledged that its previous view was that the Corps had significant authority to deviate. While it is possible that the documents that WildEarth Guardians seeks to incorporate could reveal the Corps' new rationale to be arbitrary and capricious, it is WildEarth Guardians' burden to present clear evidence that the extra-record documents can actually do this. The Court will not defeat the presumption of adequacy in the record by speculating as to what the extra-record documents may contain. Because WildEarth Guardians fails to present clear evidence that the record is inadequate, the

---

[2] Citations to the Corps' record are to the Bates page numbers in the form of USACEXXXXXX (for the part of the record compiled by the Corps) or USBORXXXX (for the part of the record compiled by Reclamation).

Court denies WildEarth Guardians' bid to have these documents incorporated into the administrative record through the first two *American Mining* exceptions.

The Corps relies in part on a memorandum authored by its Chief Counsel, Earl H. Stockdale (the Stockdale memorandum), to support its decision to withdraw from Section 7(a)(2) consultation with the FWS. (*See* USACE000127–35.) WildEarth Guardians contends that the fourth set of documents—the FWS's and National Oceanic Atmospheric Administration's (NOAA's) criticism of the Stockdale memorandum—should be included in the administrative record because "this Court should have the benefit of the expert agencies' evaluation of the substance of the Stockdale memo." (Doc. 97 at 21–22.) Again, it is unclear which exception to the presumption of administrative regularity WildEarth Guardians relies on to admit these records. Additionally, by asking the Court to admit these documents, WildEarth Guardians invites the Court to choose the FWS's and NOAA's beliefs about the Corps' legal obligations over the Stockdale memorandum's assessment of the Corps' legal obligations. If the Court were to accept WildEarth Guardians' invitation, it would drift beyond the narrow scope of arbitrary or capricious review by impermissibly substituting its judgment for that of the agency.

The Court also rejects WildEarth Guardians' bid to include documents illustrating the FWS's analyses and conclusion about the impact of the Corps' Middle Rio Grande operations on ESA-listed species. (Doc. 97 at 22; *see also* Doc. 97, Ex. 1, #27–30.) WildEarth Guardians simply does not offer clear evidence as to what exception these documents fall under that would justify rebutting the presumption of regularity in the Corps' record.

Finally, WildEarth Guardians asks the Court to admit an excerpt of the FWS's February 28, 2013 Biological Opinion showing that the Corps had committed to separately consult with the FWS regarding the upstream dams and reservoirs. (Doc. 97 at 22–23; *see also* Doc. 97, Ex.

1, #25.) WildEarth Guardians claims that "the Corps' prior commitment to undertake the now terminated consultation is highly relevant to a determination of the merits of the claim." (Doc. 97 at 23.) Assuming that WildEarth Guardians seeks to include the excerpt through the relevancy exception, the Court declines to admit the excerpt because it finds that WildEarth Guardians has not proven by clear evidence that the existing record—which both acknowledges that the Corps is breaking from its past position and explains why it is doing so, (*see* USACE000002)—is deficient without this excerpt.

### c. *Documents pertaining to the demographic and population trends of the Rio Grande silvery minnow and the southwestern willow flycatcher*

WildEarth Guardians asks the Court to include various documents pertaining to the demographics and population trends of the silvery minnow and flycatcher. (Doc. 97, Ex. 1, #41–48.)[3] According to WildEarth Guardians, these documents establish the baseline conditions of the species and their habitats at the time the species were listed for protection under the ESA, illustrate the species' demographic trajectories since time of listing, and include the FWS's determination of what the species' habitats require in order to preserve the species in the Middle Rio Grande. (Doc. 97 at 23.)

Specifically, WildEarth Guardians argues that the demographics documents fall under the first three *American Mining* exceptions. Regarding the first exception—that the agency action is not adequately explained and cannot be reviewed properly without considering the cited materials, *see Am. Mining Cong.*, 772 F.2d at 626—WildEarth Guardians contends that "the Court will be unable to apprehend how the species have fared in the years since listing, and

---

[3] WildEarth Guardians references only Doc. 97, Ex. 1, #42-48 in its motion to supplement the record, but includes #41 in the index and abstract of documents attached to its motion. (Doc. 97, Ex. 1 at 7.) Because #41 falls under the heading of "Documents pertaining to Rio Grande silvery minnow demographics," *see id.*, the Court includes #41 with #42–48. Additionally, WildEarth Guardians claims that the Corps has agreed to include #45–46 in the record. (Doc. 103, Ex. 3 at 9–10). If true, the Court will not oppose their inclusion.

correspondingly, how the Corps' on-going actions . . . have affected the species on a year-to-year basis" unless the relevant documents are admitted. (Doc. 97 at 23.) However, the record already includes the 2013 and 2015 biological assessments, (*see* USBOR0001–2062), which the Corps claims addresses proposed agency actions and their potential impact on listed species. (*See* Doc. 103 at 23.) WildEarth Guardians does not explain why these records are inadequate, and instead seems to suggest that the Court could itself study the extra-record demographics data to determine whether the Corps' activity adversely affects the listed species. The Court refuses to impermissibly engage in de novo fact finding on appeal, and, absent clear evidence that the Corps' record is inadequate, the Court follows the presumption of administrative regularity and declines to admit the documents on the basis of the first *American Mining* exception.

Next, WildEarth Guardians argues that the documents fall under the third exception—permitting a court to supplement the record with documents an agency considered but did not include in the record, *see Am. Mining Cong.*, 772 F.2d at 626—because those documents are not in the record, and "it is clear" that the Corps considered the documents. (Doc. 97 at 23.) WildEarth Guardians quickly adds that if the Corps did not consider the demographics documents, then the documents would be admissible under the second exception—permitting a court to supplement the record when "the record is deficient because the agency ignored relevant factors it should have considered in making its decision." *See Am. Mining Cong.*, 772 F.2d at 626; (*see also* Doc. 97 at 23 n.8).

WildEarth Guardians' relevancy exception argument highlights the conclusory nature of its assertion that the Corps considered the documents pertaining to demographics. Additionally, because WildEarth Guardians has not presented clear evidence that the record contains

14

inadequate demographics information, the Court rejects WildEarth Guardians' bid to include the demographics documents.

### d. Background Information concerning the Middle Rio Grande Project and the Corps' past efforts towards ESA Compliance

WildEarth Guardians also seeks to admit various extra-record materials, (Doc. 97, Ex. 1, #14–18, 19–26, 33, 40), as background information through the second *American Mining* exception—the relevant factors exception. (Doc. 97 at 24–26.) WildEarth Guardians relies on *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 791 n.3 (10th Cir. 2010), for the proposition that the relevancy exception allows a plaintiff to supplement the record with background documents to provide the court with more context. (Doc. 97 at 14.) However, the *Copar* Court admitted only a single document—a Notice of Indebtedness—which the Court felt informed its understanding of the factual context in the case. *See Copar Pumice Co.*, 603 F.3d at 791 n.3. By contrast, WildEarth Guardians' "background documents" constitute over 100 pages, and the Court has seen no clear evidence that the record is so deficient without those documents that the Court would need more context.

### e. Complexity of the Case

WildEarth Guardians argues that the case is so complex that the Court should add all of its proposed extra-record documents into the administrative record under the fourth *American Mining* exception. (Doc. 97 at 25.) The complexity exception allows a court to consider evidence outside the administrative record when "the case is so complex and the record so unclear that the reviewing court needs more evidence to enable it to understand the issues." *See Am. Mining Cong.*, 772 F.2d at 626 (citing *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir. 1977)). The exception was designed to allow a court to study documents outside the administrative record in order to better understand complex, technical matters. *See Bunker Hill*,

572 F.2d at 1292 ("[I]n the often difficult task of reviewing administrative regulations, the courts are not straightjacketed to the original record in trying to make sense of complex technical testimony.").

Rather than identifying specific technical issues and documents that would help the Court better understand those issues, WildEarth Guardians simply asserts that "this case raises complicated issues regarding compliance with the ESA's over-arching species conservation mandates in the context of a limited water supply subject to numerous competing demands." (Doc. 97 at 25.) WildEarth Guardians' bald assertion—intended to blanket all of its extra-record documents—falls far short of the clear evidence standard, and the Court declines to add to the record on this basis.

### *f. Failure to Act*

Lastly, Plaintiff WildEarth Guardians contends that because it is challenging the Corps' "failure to act," as opposed to an affirmative action by the Corps, the Court should not limit its review to the record provided by the Corps. (*See* Doc. 97 at 14–15.)

The Court first notes that despite WildEarth Guardians' claim that "agency inaction is at the heart of the dispute," (Doc. 97 at 25), only one of WildEarth Guardians' three remaining claims involves agency inaction. The Supreme Court has distinguished affirmative violations of a statute under § 1540(g)(1)(A) from failures to perform nondiscretionary duties in violation of § 1540(g)(1)(C). *See Bennett v. Spear*, 520 U.S. 154, 173 (1997) (overruled on other grounds) ("[T]he term 'violation' does not include the Secretary's failure to perform his duties as administrator of the ESA."). Only WildEarth Guardians' "Sixth Claim for Relief," which alleges that the Corps violates the procedural requirements of Section 7(a)(2) by not consulting with the FWS about its discretionary water control operations at dams and reservoirs on the Middle Rio

Grande, is a "failure to act" claim under § 1540(g)(1)(C). WildEarth Guardians' two remaining claims, the "Fifth" and "Seventh Claims for Relief," all allege that the Corps' affirmative actions in the Middle Rio Grande violate Sections 7 and 9 of the ESA by harming listed species. Those claims are actually § 1540(g)(1)(A) claims that challenge agency action, not inaction.

In any event, the Tenth Circuit applies the same standard of review to suits challenging agency action and those challenging agency inaction: "[t]he APA governs judicial review of agency action challenged through the citizen-suit provision of the Endangered Species Act," including actions "to challenge the *agency's failure to undertake consultation in the first instance.*" *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1106 n.3 (10th Cir. 2010) (emphasis added). This is a point that the Court has already made to WildEarth Guardians. *See San Diego Cattlemen's Coop. Ass'n v. Vilsack/WildEarth Guardians v. U.S. Forest Serv.*, Nos. 1:14-cv-00818 RB/WPL, 1:14-cv-00887 RB/WPL, 2015 WL 12866452 at *3, (D.N.M. Apr. 20, 2015) (quoting *Sierra Club v. United States Dep't of Energy*, 26 F. Supp. 2d 1268, 1271 (D. Colo. 1998)) ("The judicial review provisions of the APA do not distinguish between a claim that an agency unlawfully failed to act and a claim based on action taken.").

Here, WildEarth Guardians is bringing suit under the citizen-suit provision of the Endangered Species Act, challenging the Corps' failure to undertake consultations with the FWS. Thus, WildEarth Guardians' suit is governed by the APA, and the same standards of review apply in this case as with any other case governed by the APA: the Court determines whether the challenged agency action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and the Court limits its review to the documents contained in the administrative record provided by the agency unless there are exceptional circumstances.

## IV. CONCLUSION

A court reviewing agency action under the APA presumes the record compiled by the agency is adequate, and limits its review to that record. Only when the proponent of extra-record materials defeats the presumption of adequacy by showing clear evidence that the materials sought to be added fit within one of a few narrow exceptions does a court look outside the administrative record. The Court finds that WildEarth Guardians has not presented clear evidence to rebut the presumption of adequacy and to convince the Court to admit the extra-record material.

**THEREFORE**,

**IT IS ORDERED** that, except as to the documents the Corps has agreed to include in the record and the RPA Compliance Reports for the years 2003–06, 2011, and 2014, Plaintiff WildEarth Guardians' Motion and Memorandum in Support of Amended Motion to Complete and/or Supplement the Administrative Record Lodged by Federal Defendant United States Army Corps of Engineers (Doc. 97) is denied.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**