# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

WILDEARTH GUARDIANS,

      Plaintiff,

v.                                        No. CIV 14-0666 RB/SCY

UNITED STATES ARMY CORPS
OF ENGINEERS,

      Federal Defendant,

      and

MIDDLE RIO GRANDE
CONSERVANCY DISTRICT,

      Intervenor-Defendant.

## AMENDED[1] MEMORANDUM OPINION AND ORDER

*And Elijah the Tishbite, who was of the inhabitants of Gilead, said unto Ahab, ["]As the LORD God of Israel liveth, before whom I stand, there shall not be dew nor rain these years, but according to my word.["]*

*1 Kings* 17:1 (King James).

New Mexico is languishing in the midst of an unprecedented, prolonged drought. As it stands, the many stakeholders who depend on water in the region have become increasingly embroiled in a perilous zero sum game. There simply is not enough water for everyone, and with painful realities imminent, how to best allocate the limited water is a deeply polarizing question.

If the Court possessed the power of Elijah, it would call down rain to nurture our parched state. But the Court has no such power. All the Court can do is answer the legal question central to this matter: is the United States Army Corps of Engineers (Corps)'s decision not to consult with the United States Fish and Wildlife Service regarding its Middle Rio Grande operations

---

[1] As explained in its August 14, 2018 Memorandum Opinion and Order (Doc. 139), the Court will amend this Opinion on pages 2, 29–30, and 40 to clarify its decision on the maintenance activities at issue.

arbitrary or capricious? Plaintiff WildEarth Guardians (Guardians) thinks so, but, surprisingly, Guardians initially ignored a lengthy and detailed document Corps produced to explain its decision.

Because one cannot simply ignore an agency's explanation when challenging the agency's decision, the Court **denies** most of Guardians's motion. With regard to Corps's maintenance operations in Abiquiu Dam tunnel and the Jemez Canyon stilling basin, the Court withholds final judgment and **remands** to Corps for clarification and explanation.

## BACKGROUND

### I. Backdrop of the litigation.

Water is perhaps the most important of all the scarce resources, especially in the American southwest, where human inhabitants rely heavily on Rio Grande water for everything from drinking to farming. Recognizing the scarcity and importance of Rio Grande water, Colorado, Texas, and New Mexico entered into an agreement, called the Rio Grande Compact, specifying how to share water in the region and creating the Rio Grande Compact Commission to help administer the compact.

Congress, too, recognized the importance of Rio Grande water. When the Middle Rio Grande Conservancy District (MRGCD)[2] faltered, Congress approved the Middle Rio Grande Project. *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1104 (10th Cir. 2010). The Middle Rio Grande Project was one of two major projects in the area, and it empowered Corps to construct, maintain, and operate dams and other devices on the Rio Grande and its tributaries. *See id.* The operations were not, however, to interfere with the Rio Grande Compact, as Congress strictly regulated Corps's operations and restricted what Corps could do

---

[2] The MRGCD was formed to consolidate water rights and facilitate irrigation in the Middle Rio Grande. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1104 (10th Cir. 2010).

without the approval of the Rio Grande Compact Commission. *See* Flood Control Act of 1960, Pub. L. No. 86-645, § 203, 74 Stat. 480, 493 (1960) (the "1960 FCA"). Congress's other major project in the area, run by the United States Bureau of Reclamation (Reclamation), was the San Juan-Chama Project, which "imports water from the Colorado River Basin to the Rio Grande Basin." *See Rio Grande Silvery Minnow*, 601 F.3d at 1104; *see also* Pub. L. No. 87-483, 76 Stat. 96 (1962) ("San Juan-Chama Act").

But humans are not, obviously, the only living beings to rely on Rio Grande water. The Rio Grande silvery minnow also depends on the water for survival. Once one of the most abundant species of fish in the Rio Grande, the minnow "now occupies a small portion of its historic range, primarily existing in the San Acacia Reach—a sixty-mile stretch of river south of Albuquerque, New Mexico, and north of Elephant Butte Reservoir." *See Rio Grande Silvery Minnow*, 601 F.3d at 1104. The minnow's decline may have been caused by low spring run-off and human manipulation of the Rio Grande, such as regulation of river flow to provide for irrigation. *See id.* In 1994, the minnow was listed as endangered under the Endangered Species Act (ESA). *Id.*

Another species that relies on the Rio Grande is the southwestern willow flycatcher. The flycatcher is a small bird, approximately 15 cm long, which breeds in southwestern states. *See* Final Rule Determining Endangered Status for the Southwestern Willow Flycatcher, 60 Fed. Reg. 10694 (Feb. 27, 1995). The flycatcher's habitat, consisting primarily of deciduous shrubs and trees, is growing increasingly scarce due to "brood parasitism and lack of protective regulations." *Id.* In 1995, the flycatcher was listed as endangered under the ESA. *Id.*

In an effort to protect the minnow and flycatcher, Guardians, an environmental advocacy organization, has sued Corps for conducting its Middle Rio Grande Project operations in a manner that allegedly violates sections 7 and 9 of the ESA.

Section 7(a)(2) of the ESA requires federal agencies to ensure that they do not "jeopardize the continued existence" of or harm any endangered species or its critical habitat. *See* 16 U.S.C. § 1536. To facilitate compliance with this substantive command, § 7(a)(2) provides that an agency considering an action must first determine whether the proposed action may affect an endangered species or its habitat. 50 C.F.R. § 402.14(a). If the action may do so, the agency must consult with the United States Fish and Wildlife Service (FWS). *See* 50 C.F.R. §§ 402.13, 402.14. At the end of consultation, FWS issues a Biological Opinion, which includes FWS's assessment of the likely effects of the proposed agency action. *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)–(h). If FWS believes the proposed action is likely to jeopardize or harm an endangered species or its habitat, FWS issues a Reasonable and Prudent Alternative that the agency may take to avoid adversely affecting the endangered species. 50 C.F.R. § 402.14(h). At that point, an agency must either terminate an action likely to harm an endangered species (according to FWS's Biological Opinion), seek an exemption, or follow the Reasonable and Prudent Alternative. *Rio Grande Silvery Minnow*, 601 F.3d at 1106.

Crucially, § 7(a)(2) is subject to an important limitation. The section only applies to actions that an agency has discretion or control over—so if the agency has no discretion to alter its actions, then an agency need not consult with FWS over that particular action. 50 C.F.R. § 402.03.

In addition to § 7(a)(2), § 9 of the ESA prohibits any federal agency from "taking" a listed species. 16 U.S.C. § 1538(a)(1). To "take" in this context means to "harass, harm, pursue,

hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." 16 U.S.C. § 1532(19). If, after consultation, FWS finds that an agency's action will result in incidental taking of an endangered species, FWS may include an Incidental Take Statement in its Biological Opinion. 16 U.S.C. § 1536(b)(4). Any taking covered by the scope of the Incidental Take Statement will not violate § 9. *See* 16 U.S.C. § 1536(o)(2).

According to Guardians, Corps is violating § 7(a)(2) by jeopardizing the minnow and flycatcher through its Middle Rio Grande operations while not consulting with FWS regarding such operations. (*See* Doc. 66 at 36–37.) Additionally, Guardians alleges that Corps is violating § 9 by "taking" the minnow through its operations. (*See id.* at 37.)

For this matter, a request to reverse an agency action, Guardians focuses on § 7(a)(2). According to Guardians, Corps's decision that it does not have sufficient discretion over its Middle Rio Grande operations to require consultation is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. (Doc. 120 at 55.) As such, Guardians asks this Court to force Corps to consult with FWS. (*Id.* at 56.)

**II. More on Corps and why it believes it does not have discretion to deviate.**

**a. Corps's Middle Rio Grande operations.**

Under the Middle Rio Grande Project, Corps operates and maintains four dams on the Rio Grande and its tributaries: Abiquiu, Cochiti, Galisteo, and Jemez Canyon Dams. (A.R. 000004 (2014 Reassessment) at 9.) These dams are operated in a "coordinated and concerted manner," in accordance with § 203 of the 1960 FCA. (*Id.*)

Abiquiu was initially authorized only for flood and sediment control, but later legislation gave Abiquiu the authority to store San Juan-Chama Project water, *see* Pub. L. No. 97-140, § 2(b), 95 Stat. 1717 (1981) ("P.L. 97-140"), and natural Rio Grande basin water, *see* Pub. L.

No. 100-522, § 1, 102 Stat. 2604 (1988) ("P.L. 100-522"). (2014 Reassessment at 9–10.) Only San Juan-Chama Project water is currently stored at Abiquiu. (*Id.* at 10.)

Cochiti, like Abiquiu, was originally only authorized for flood and sediment control. (*Id.* (citing 1960 FCA).) Later legislation added the authority to create a permanent pool at Cochiti Lake for the "conservation and development of fish and wildlife resources . . . ." (*Id.* (citing Flood Control Act of 1964, Pub. L. No. 88-293, 78 Stat. 171 (1964) (the "1964 FCA")).) Corps has maintained a permanent pool of San Juan-Chama Project water at Cochiti since 1975. (*Id.*)

Galisteo Dam is authorized only for flood and sediment control. (*Id.* (citing 1960 FCA).) Galisteo "is ungated, and its reservoir is normally dry, with most inflows occurring in the summer months as a result of thunderstorm activity." (*Id.*)

Jemez Canyon Dam and Reservoir, which has been in operation since 1953, was authorized by the Flood Control Act of 1948, Pub. L. No. 80-858, 62 Stat. 1171 (1948) (the "1948 FCA"), and the Flood Control Act 1950, Pub. L. No. 81-516, 64 Stat. 170 (1950). (2014 Reassessment at 10.)

### b. Corps's consultation with FWS.

In the early 2000s, Corps and Reclamation together voluntarily initiated § 7(a)(2) consultation with FWS regarding the effects of their Middle Rio Grande operations. (*Id.* at 5 n.1.) That consultation yielded FWS's 2003 Biological Opinion, which expired in 2013. (*See id.* at 6 n.9.) As the 2003 Biological Opinion neared expiration, Corps sought to consult with FWS again. This time, however, Corps wanted to consult independently instead of combining the Middle Rio Grande actions of both Corps and Reclamation—that is, Corps wanted FWS to isolate and identify actions specific to Corps for which Corps is responsible. (*See id.* at 5.)

According to Corps, FWS initially agreed to consult solely on Corps-specific actions, and Corps and FWS consulted under that agreement. (*Id.* at 5–6; *see also* A.R. 000127.) In 2013, however, FWS apparently told Corps that "it could not honor its commitment to provide the Corps with an agency-specific [Biological Opinion]." (2014 Reassessment at 6; *see also* A.R. 000127.)

This about-face prompted Corps to withdraw from consultation with FWS. (2014 Reassessment at 6; *see also* A.R. 000127.) In its letter to FWS withdrawing from consultation, Corps explained that it had received guidance from headquarters directing it to carefully review its legal requirements under § 7. (*See* A.R. 000128.) As a result, Corps planned to reassess its actions and legal obligations in the Middle Rio Grande. (*See* A.R. 000127.) Corps reserved the right to reinitiate consultation unless it found that its actions were wholly non-discretionary or part of the environmental baseline. (*Id.*)

**c. 2014 Reassessment.**

In reassessing its legal obligations in the Middle Rio Grande, Corps identified 13 actions that it undertakes and analyzed whether it had discretion over any of those actions. Because the information here is critically important in resolving this matter, the Court briefly summarizes Corps's discretion conclusions for each of the 13 actions.

1. <u>Determination of the Maximum Safe Channel Capacity.</u>

The first action that Corps identified was its responsibility, mandated in § 203 of the 1960 FCA, to determine the maximum safe channel capacity. (2014 Reassessment at 11.) Corps believed the maximum safe channel capacity was the maximum safe flow at Albuquerque, meaning the "maximum rate of flow that can be carried at the time in the channel of [the] Rio Grande through the middle valley without causing flooding of areas protected by levees or

unreasonable damage to channel protective works . . . ." (*See id.* at 11–12 (citing 1960 FCA §§ 203(a) and (c)).)

Corps initially specified a maximum safe flow of up to 5,000 cubic feet per second (cfs) at Albuquerque. (*Id.* at 12.) After experimentally increasing the flow and informally consulting with FWS, Corps increased the maximum channel capacity from 5,000 cfs to 7,000 cfs, which has remained the maximum safe channel capacity since 1996. (*Id.*)

Though it acknowledged its previous informal consultation with FWS regarding the flow rate, Corps determined on reconsideration that since the 1960 FCA does not include permission to deviate for environmental reasons, the maximum safe flow turns only on engineering judgment. (*See id.* at 13.) As such, Corps determined that it has no discretion to deviate for environmental purposes.

2. Flood Control Operation.

Another action Corps takes on the Rio Grande is flood control. This function was mandated by § 203 of the 1960 FCA, which states that "Cochiti Reservoir, Galisteo Reservoir, and all other reservoirs constructed by the Corps of Engineers as a part of the Middle Rio Grande project will be operated solely for flood and sediment control . . . ." (*Id.* at 13–14 (citing 1960 FCA § 203).) As mentioned, the 1960 FCA also provides that "the outflow from Cochiti Reservoir during each spring flood and thereafter will be at the maximum rate of flow that can be carried . . . without causing flooding of areas protected by levees or unreasonable damage to channel protective works." 1960 FCA § 203(a). Section 203(b) goes on to say that Galisteo and Jemez Canyon Reservoirs are to release water "at the maximum rate practicable" during summer floods "or thereafter." 1960 FCA § 203(b). Additionally, releases from July through October

should also be "limited to the amounts necessary to provide adequate capacity for control of subsequent summer floods." *Id.*

Corps interpreted the above provisions of the 1960 FCA—including the "or thereafter" language—to mean that the stringent flood control provisions outlined in § 203 apply year-round. (*See* 2014 Reassessment at 13–15.) This meant that Corps should always operate the dams for flood control and release water at the maximum safe and practicable rate that complies with all Congressional commands. (*See id.*) Consistent with this interpretation, Corps repudiated its old practice of distinguishing between periods of summer storm floods and spring runoff for purposes of consulting with FWS, since, according to Corps, "Congress has mandated the same requirements for flood operation throughout the year." (*See id.* at 15.) Similarly, Corps turned away from its old practice of deviating from standard operations to prevent damage to *non-protected* works—specifically, to protect a historic railroad bridge crossing and the adjacent spoil bank levee. (*See id.* at 15–16.) According to Corps, Congress only allowed it to moderate water release to guard *protected* levees and channel protective works. (*See id.* at 16.) In conclusion, Corps determined that its Middle Rio Grande operations must be run only for flood and sediment control and are so strictly regulated that Corps does not have sufficient discretion to require consultation. (*See id.* at 16.)

3. Release of Carryover Storage.

After studying §§ 203(a) and (c) of the 1960 FCA, Corps determined that the questions of how it must retain water, when it must retain water, and how it can release retained water are all strictly regulated by the 1960 FCA. (*See id.* at 18.)

According to Corps, § 203(a) prevents Corps from releasing water from Cochiti during the months from July to October when there is more than 212,000 acre-feet (ac-ft) of storage

space and the inflow of water is less than 1,500 cfs. (*Id.* at 16 (citing 1960 FCA § 203(a)).) Corps says this provision is "to prevent the diversion or depletion of water . . . that would otherwise have been delivered downstream to the State of Texas, but was detained by flood-control operation." (*Id.* at 16–17.) Corps adds that this retention requirement typically applies when spring runoff water is still detained in Cochiti Lake into July and the flow at Otowi gage is less than 1,500 cfs. (*See id.* at 16.)

Corps claims that a similar retention provision in § 203(b) governs carryover storage in Galisteo and Jemez Canyon Reservoirs. (*Id.* at 17.) Section 203(b) limits the release from Galisteo and Jemez Canyon Reservoirs from July through October to the amount necessary to leave sufficient space for subsequent summer floods. *See* 1960 FCA § 203(b). Galisteo Reservoir, Corps adds, has an unregulated outlet structure, which is physically unable to retain carryover storage, so the flow and retention provisions in 203(b) apply only to Jemez Canyon Reservoir. (*See* 2014 Reassessment at 17 n.41.)

After the July through October period, Corps posits that the carryover water should be released from all dams as expeditiously as allowed, pointing to § 203(c) of the 1960 FCA, which requires that "all reservoirs will be evacuated completely on or before March 31 of each year . . . ." (*See id.* at 17 (citing 1960 FCA § 203(c)).)

Finally, the Rio Grande Compact Commissioner of either New Mexico or Colorado can require Corps to release carryover water at the maximum safe flow. (*See id.* at 17–18 (citing 1960 FCA § 203(c)).)

After considering and interpreting the above provisions, Corps concluded that it has insufficient discretion in its release of carryover storage to require consultation. (*Id.* at 18.)

4.  <u>Flow Reduction to Inspect Abiquiu Dam Tunnel.</u>

Corps believes that it has an inherent, non-discretionary responsibility to maintain civil works structures authorized by Congress. (*Id.* at 19 (citation omitted).) Accordingly, Corps's position is that it does not need to consult with FWS about the *fact* of maintenance. (*See id.*) However, Corps acknowledges that it has discretion over the *manner* in which it conducts maintenance, and should consult with FWS if its current maintenance practices adversely affect endangered species. (*See id.*)

To maintain Abiquiu Dam, Corps conducts periodic inspections of the outlet tunnel. (*Id.*) During the inspection, Corps must suspend releases from Abiquiu for about an hour while personnel are physically present in the tunnel. (*See id.*) These inspections usually occur during low flow periods in the winter, to minimize disruption, but could technically occur any time there is a structural or safety concern. (*See id.*)

Since inspection of Abiquiu requires a decrease in discharge, the current maintenance practice potentially affects endangered species. (*See id.*) Though Corps had previously determined that the temporary suspension of discharge does not affect endangered species, the 2014 Reassessment recommended that Corps "verify or reevaluate the effects" of the suspension. (*See id.*) Only if the discharge suspension may affect endangered species or their critical habitats should Corps consult with FWS. (*See id.*)

5.  <u>Flow Adjustment to Flush Jemez Canyon Dam Stilling Basin.</u>

There is a stilling basin downstream from the outlet of Jemez Canyon Dam. (*Id.* at 20.) Sediment collects in the basin, and Corps must flush the basin to prevent high flows from lapping over the basin's walls. (*Id.*) To flush the basin, Corps detains inflow for up to four or five

days before releasing the detained water at a rate of about 600 cfs to rinse sediment from the basin. (*Id.*) This flushing operation is done when required, typically once or twice a year. (*Id.*)

As with the inspection of the Abiquiu Dam tunnel, Corps believes that maintenance of the stilling basin is a nondiscretionary responsibility. (*Id.*) But the manner of flushing the basin, which decreases and then subsequently increases discharge, could affect organisms downstream. (*Id.*) The 2014 Reassessment recommended that Corps verify or reevaluate the effects of the flushing operation, and only consult with FWS if the operation may affect endangered species or their critical habitats. (*Id.*)

6. Flow Reduction to Install and Remove Irrigation Outlet Gates at Cochiti Dam.

There are two bulkhead outlet gates in the walls of a stilling basin below Cochiti Dam. (*Id.*) The outlet gates prevent any water from entering the canals during the non-irrigation season, and the gates are removed during the irrigation season. (*See id.*) When the gates are removed, fish sometimes enter the irrigation canal and die in the agricultural ditches and fields. (*See id.* at 21.) To prevent this, fish screens are installed when the bulkhead gates are removed during the irrigation season, and then the fish screens are swapped out for the gates during the non-irrigation season. (*See id.*) The fish screens and bulkhead gates are submerged, so hydrostatic pressure prevents the exchange of the screens and gates unless Corps decreases the total release rate from Cochiti Dam from 150 to 100 cfs. (*See id.* at 20.)

In conducting the 2014 Reassessment, Corps unearthed a June 1967 Memorandum of Agreement that "outlined the rights and responsibilities of the Corps, Reclamation, and [the MRGCD] regarding . . . construction of new irrigation outlets in the Cochiti Dam stilling basin." (*See id.* at 21.) Corps claims that section four of the Memorandum of Agreement "makes it

apparent that Reclamation—not the Corps—is responsible for operation (removal / installation) of the two bulkhead gates to the irrigation canals." (*See id.*)

Reevaluating its legal obligations in light of the information above, Corps determined that its only action is the reduction in flow from Cochiti Dam to facilitate Reclamation or MRGCD's installation of fish screens or outlet gates. (*See id.* at 22.) Since Corps only performs the flow reduction at Reclamation's request to assist with Reclamation or MRGCD's obligations, Corps maintains that either Reclamation or MRGCD should be responsible for consultation about the flow reduction. (*See id.* at 22–24.)

### 7. Delivery of Water to Offset Evaporation at Cochiti Lake.

Corps explains that the Flood Control Act of 1964 authorized a permanent pool of 1,200 acres (about 50,000 ac-ft) "for conservation and development of fish and wildlife resources and for recreation . . . ." (*Id.* at 24 (citing 1964 FCA).) The 1964 FCA authorizes the Secretary of the Interior to use San Juan-Chama Project water to fill the pool. (*Id.*) The 1964 FCA "also mandated the delivery of 'sufficient water annually to offset the evaporation' from the permanent pool . . . ." (*Id.* (citing 1964 FCA).) The water for offsetting evaporation comes from the San Juan-Chama Project water stored in Heron Reservoir. (*Id.*)

Corps construes the commands of the 1964 FCA as requiring it to maintain a permanent pool at Cochiti. (*Id.* at 25.) The manner in which the permanent pool is maintained, however, is subject to consultation if it affects endangered species or their critical habitats. (*Id.*) Since Reclamation is the proponent of sending San Juan-Chama water to Cochiti to replenish the permanent pool and is currently engaged in consultation with FWS, Corps says that it will "coordinate with Reclamation . . . so that they may re-characterize [the filling of Cochiti Lake

with San Juan-Chama water] as a Reclamation action . . . rather than as an interrelated and interdependent Corps action," as they had classified the action in previous years. (*Id.* at 24–25.)

### 8. Storage of San Juan-Chama Project Water in Abiquiu Reservoir.

Corps explains that the San Juan-Chama Act authorized the San Juan-Chama Project, which is run by Reclamation and diverts water from upper tributaries of the San Juan River to the Rio Grande basin. (*Id.* at 25.) Another law later authorized Corps to store San Juan-Chama water in Abiquiu Reservoir. (*Id.* (citing P.L. 97-140).) Under P.L. 97-140, the "Secretary of Interior (through Reclamation) is also authorized to deliver such water from Heron Reservoir to [San Juan-Chama] Project water users who have agreements for storage with the Corps." (*Id.* at 25–26.) Corps currently stores about 180,124 ac-ft of San Juan-Chama water at Abiquiu. (*Id.* at 72, Table 5.3.)

Users who have rights to San Juan-Chama water and contracts with Corps for storage may call for their water. (*See id.* at 26.) Corps believes it must deliver San Juan-Chama water to those parties on demand. (*Id.*) According to Corps, it "has no independent ownership rights, authority, or discretion regarding release or water delivery," and, as such, does not need to consult over the storage or delivery of San Juan-Chama water. (*Id.* at 26–27.)

### 9. Storage of Rio Grande System Water in Abiquiu Reservoir.

Congress authorizes Corps to store up to 200,000 ac-ft of Rio Grande water at Abiquiu Reservoir in lieu of San Juan-Chama water, to the extent that parties with rights to San Juan-Chama water do not require Corps to store the water at Abiquiu. (*See id.* at 28 (citing P.L. 100-522).) Corps says that Abiquiu currently stores only San Juan-Chama water, and that "there are no agreements for storage of Rio Grande system water," so consultation is unnecessary. (*See id.*)

10. <u>Hydropower Operation.</u>

The County of Los Alamos constructed, operates, and maintains a run-of-the-river hydroelectric power facility. (*Id.*) Any "releases below 2,500 cfs are diverted through the power plant for generation of electricity." (*Id.*) Corps does not release any water from Abiquiu Dam specifically for the benefit of the power plant, and the power plant, as a run-of-the-river facility, "has no impact on reservoir storage or releases." (*Id.*) As such, Corps believes there is no Corps action that requires consultation. (*Id.*)

11. <u>Pass-Through Operation and Agency Coordination.</u>

FWS has stated that Corps's "standard procedures of passing all inflow unhindered when not in flood control operation, as well as the Corps'[s] coordination with other water managers, constituted interrelated and interdependent actions requiring ESA consultation." (*Id.* at 29.) In the 2014 Reassessment, Corps disagrees. (*See id.* at 30.)

Corps believes that, except for its unexercised authority to store Rio Grande system water in Abiquiu Lake, it "has no authority to store or otherwise regulate [Rio Grande] water." (*See id.* at 29.) In allowing Rio Grande water to pass unhindered through its dams, Corps does not need to take affirmative action for Jemez Canyon and Galisteo Dams, since those two dams "lack any permanent water supply or recreation pools," and "[s]treamflow simply passes through the open outlet works up to the discharge that invokes flood control operation." (*See id.*)

As for Abiquiu and Cochiti Dams, since they store San Juan-Chama water, the "outlet gates at these dams must be adjusted, usually daily, to pass Rio Grande system water while still retaining the precise volume of [San Juan-Chama] Project water in storage." (*Id.*) Corps contends that the outlet gate adjustment is simply the necessary product of its concurrent duties to maintain a certain amount of San Juan-Chama water at Abiquiu and Cochiti Dams, and to pass

through, unhindered, the maximum allowable amount of Rio Grande water. (*See id.*) As such, Corps believes the outlet gate adjustment is not a discretionary action that triggers consultation. (*See id.*)

Corps also claims that "regular coordination and communication" among managers of the many water management facilities "simply is a requirement of the complex management system and cannot be construed as an action which, in and of itself, could affect a listed species or its designated critical habitat." (*See id.* (citing 50 C.F.R. § 402.02).) Corps adds that when another water management agency—such as Reclamation or MRGCD—delivers Rio Grande water downstream, that delivery cannot be considered an "interrelated or interdependent effect," since "[t]here is no action by the Corps that causes an effect relative to the ESA, interrelated or otherwise." (*See id.* (citing 50 C.F.R. § 402.02[3]; *Am. Rivers v. NOAA Fisheries*, No. CV-04-00061-RE, 2006 WL 1983178, at *3 (D. Or. July 14, 2006)).)

Corps believes that since the pass-through operations are nondiscretionary and passive, and coordination and delivery of water downstream by another agency is not an interrelated or interdependent action, FWS's previous classification is incorrect, and Corps does not need to consult over pass-through operations or agency coordination. (*See id.* at 30.)

12. Emergency Operation.

Section 203(d) of the 1960 FCA enables Corps to suspend the rules from the rest of the statute if there is an emergency that affects the safety of major structures or endangers lives. (*See id.* (citing 1960 FCA § 203(d)).) Corps reasons that since emergencies are by their nature unexpected, it would not make sense to consult prior to an emergency. (*Id.*) In the event of an emergency, Corps says proper procedure is to follow 50 C.F.R. § 402.05, a Corps regulation covering emergencies. (*Id.*)

---

[3] The Reassessment cites 50 C.F.R. § 152.02, but this is likely a typographical error.

13. <u>Effects of Sediment Retention.</u>

Though "sediment control is an authorized purpose for all four Corps dams in the middle Rio Grande basin," Corps has not "purposely operated to detain sediment at [its] facilities" since 2001. (*Id.* at 31.) The dams, however, naturally collect sediment to some degree, and the pools of water maintained at Cochiti and Abiquiu pursuant to the 1964 FCA, San Juan-Chama Act, and P.L. 97-140 also trap sediment. (*See id.*) This sediment retention creates downstream channel incision, which may affect the silvery minnow's habitat. (*Id.*)

Any effect on the silvery minnow, however, is incidental to the passive sediment retention that occurs as Corps executes its statutorily-mandated duties. (*See id.*) Thus, Corps determined that it does not need to consult on the sediment retention unless it takes affirmative actions to retain sediment. (*See id.*)

In sum, Corps feels that it does not need to consult on 11 of 13 identified actions because those actions are either non-discretionary, not Corps actions, or not applicable given certain facts (e.g., unpredictable nature of emergencies or no Rio Grande water stored in Abiquiu Reservoir). (*See id.* at 33–34.) Corps believes the remaining two actions, involving maintenance, are also non-discretionary. (*See id.* at 33.) But the manner in which those actions are executed would require consultation if the execution could affect endangered species or their habitats. (*See id.*)

**LEGAL STANDARD**

A court overturns an agency's action only if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (citing 5 U.S.C. § 706(2)(A)). The agency action enjoys a presumption of validity, and it is the burden of the party petitioning the Court to overturn agency action to prove that such action is arbitrary or capricious. *See id.* To prove an agency action to be

arbitrary or capricious, the petitioner must prove that the agency relied on factors that Congress did not intend for it to consider, "entirely failed to consider an important aspect of the problem," gave an explanation that contradicts the evidence before the agency, or that the agency's rationale was so implausible that it "could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## DISCUSSION

The 2014 Reassessment is the lynchpin of Corps's conclusion that it has no discretion over its Middle Rio Grande operations—and its subsequent refusal to initiate § 7(a)(2) consultation. As the Reassessment was the reason behind Corps's actions, whether Corps acted arbitrarily, capriciously, in abuse of its discretion, or in violation of the law depends heavily on the validity of the 2014 Reassessment.

## I. The 2014 Reassessment is not post-hoc rationalization.

Inexplicably, Guardians did not even mention the 2014 Reassessment in its brief accusing Corps of reaching an arbitrary decision on its discretion in the Middle Rio Grande. (*See* Doc. 120.) After Corps highlighted Guardians's omission, Guardians claimed that it did not need to consider the Reassessment. (*See* Doc. 126 at 6 n.2.) According to Guardians, since Corps broke off consultation with FWS in 2013 and did not issue the Reassessment until 2014, the Reassessment was not the real reason behind the termination of consultation. (*See id.*)

But a review of Corps's letter to FWS terminating consultation undermines Guardians's argument. In its letter terminating consultation, Corps said that it was withdrawing from consultation because its headquarters had instructed it to scrutinize its ESA obligations, and because FWS was unwilling to identify Corps-specific actions in the Rio Grande. (*See* A.R. 000127–28.) The letter explains that Corps was going to reevaluate its actions and legal

obligations in the region. (*See* A.R. 000127.) If Corps found that it had discretion to deviate in its actions, it was willing to reinitiate consultation. (*See id.*)

Given Corps's letter, the Court concludes that the 2014 Reassessment is the real reason why Corps is not currently consulting with FWS. Corps clearly referenced an upcoming reevaluation of its actions and legal obligations when it terminated consultation, so the Reassessment was unlikely to have been created solely for purposes of litigation. And the Reassessment was also the source of many of Corps's arguments in this litigation, arguments that Guardians has been all-too-happy to dispute. Where did Guardians think those arguments came from? Finally, Corps held open the possibility of reinitiating consultation, so Corps's present, ongoing refusal to consult can fairly be attributed to the 2014 Reassessment.

## II. The Court gives the 2014 Reassessment *Skidmore* deference where Corps interprets legislation.

In its Reassessment, Corps pondered many considerations, including factual ones. (*See, e.g.*, 2014 Reassessment at 17 n.41.) But the primary thrust of Corps's analysis was driven by its interpretation of statutes.

### a. The law of deference to agency interpretation of statutes.

In judging Corps's interpretation of statutes, the Court must first determine how much deference to give Corps's interpretation.

Under *Chevron* deference, a court defers "to an agency's interpretation of a statute that it is responsible to implement if (1) the statute is ambiguous or silent as to the issue at hand and (2) the agency's interpretation is neither 'arbitrary, capricious, [n]or manifestly contrary to the statute.'" *Carpio v. Holder*, 592 F.3d 1091, 1096 (10th Cir. 2010) (quoting *Herrera-Castillo v. Holder*, 573 F.3d 1004, 1007 (10th Cir. 2009)). *Chevron* deference is warranted if "'Congress delegated authority to the agency generally to make rules carrying the force of law,' and the

agency's interpretation of the statute was issued pursuant to that authority." *Id.* at 1096–97 (citing *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). Usually, a binding interpretation warranting *Chevron* deference is created through adjudication or notice-and-comment rulemaking. *See id.* at 1097 (citing *Mead*, 533 U.S. at 226–27).

In some cases, however, an agency's interpretation can receive *Chevron* deference even when it is not the result of adjudication or notice-and-comment rulemaking. *See WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1188 (10th Cir. 2013) (citing *Barnhart v. Walton*, 535 U.S. 212, 222 (2002)). In those cases, the "agency's expertise, the importance of the question to the agency's administration of the statute, and the degree of consideration the agency has given the question" convince the Court that *Chevron* deference is otherwise appropriate. *Id.* (citing *Barnhart*, 535 U.S. at 222).

But most times, if an agency creates a non-binding interpretation outside of adjudication or notice-and-comment rulemaking, such interpretation is given *Skidmore* deference. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (explaining that agency interpretations "contained in policy statements, agency manuals, and enforcement guidelines" created without notice-and-comment rulemaking or adjudication lack the force of law and receive *Skidmore*, not *Chevron*, deference). How much respect a court gives an agency's interpretation under *Skidmore* deference depends on factors such as "the thoroughness evident in [the agency's] consideration, the validity of [the agency's] reasoning, [and the agency's] consistency with earlier and later pronouncements . . . ." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Ultimately, a court gives an agency as much deference under *Skidmore* as the agency's interpretation has power to persuade. *Carpio*, 592 F.3d at 1098 ("The paramount consideration is whether the [agency's] decision has 'the power to persuade.'") (quoting *Skidmore*, 323 U.S. at 140).

**b. The parts of the 2014 Reassessment that interpret statutes receive *Skidmore* deference.**

The 2014 Reassessment was not the product of notice-and-comment rulemaking or formal adjudication. It only made recommendations regarding consultation with FWS, (*see* 2014 Reassessment at 34–35), and Guardians has not alleged that Corps is bound by the Reassessment. Consequently, the parts of the Reassessment that interpret statutes appear to be non-binding agency interpretations subject only to *Skidmore* deference. *See Christensen*, 529 U.S. at 587.

Though Corps argued that *Chevron* deference applies in this case, (*see* Doc. 124 at 22–23), Corps has not explained why its expertise, the importance of the question, or the degree of its consideration should overcome the presumption of *Skidmore* deference.[4] *Skidmore* is therefore the proper level of deference to give the parts of the 2014 Reassessment that analyze statutes.

**III. The parts of the 2014 Reassessment that analyze statutes are persuasive.**

The central question under *Skidmore* deference is whether Corps's interpretations of law have the power to persuade.

**a. The parts of the 2014 Reassessment analyzing statutes are persuasive because of their procedural validity.**

In deciding the persuasiveness of an agency's interpretation of law, courts can examine procedural hallmarks of persuasiveness, such as the thoroughness evident in the agency's interpretation, the agency's care in determining a solution, or whether the agency leverages its expertise. *See Carpio*, 592 F.3d at 1098 (citations omitted).

Here, Corps was meticulous and thorough. Instead of indiscriminately combining all its Middle Rio Grande actions together, as Guardians does, Corps painstakingly identified the

---

[4] Guardians's position on deference is unclear. (*Compare* Doc. 120 at 46 (Guardians's opening brief) (explaining that *Chevron* governs), *with* Doc. 126 at 9–10 (Guardians's reply brief) (rejecting *Chevron* and arguing that *Skidmore* applies).)

specific actions for which it is responsible. Corps then examined whether it had discretion for each action. In doing so, Corps looked to caselaw (for example, citing *Am. Rivers v. NOAA Fisheries*), (*see* 2014 Reassessment at 29); statutes (for example, parsing the text of the 1960 FCA), (*see id.* at 13); and its own expertise (for example, noticing that Galisteo Reservoir, as an unregulated outlet structure, is physically incapable of retaining carryover storage), (*see id.* at 17 n.41). The Court is convinced that Corps's 2014 Reassessment was the result of thorough, careful, and expert analysis.

**b. The parts of the 2014 Reassessment analyzing statutes are persuasive because of their substantive validity.**

The persuasiveness of an agency's interpretation also depends on the interpretation's substantive validity. *See Carpio*, 592 F.3d at 1098 (citations omitted). Corps's consultation opinion regarding its flood control, release of carryover storage, pass-through procedures, and emergency operations, as well as its determination of the channel capacity, (Reassessment action numbers 1–3, 11–12) is largely driven by its analysis of the 1960 FCA. Corps's consultation opinion regarding its creation and maintenance of permanent pools at Abiquiu and Cochiti (Reassessment action numbers 7 and 8) is largely based on its interpretation of P.L. 97-140, the 1960 FCA, and the 1964 FCA. The Court will address each cluster of activities in turn.

        1.   Flood control, carryover storage release, pass-through procedures, emergency operations, and determination of channel capacity (Reassessment action numbers 1–3, 11–12).

The 1960 FCA provides that "all . . . reservoirs constructed by the Corps . . . as a part of the Middle Rio Grande project will be operated *solely* for flood control and sediment control." 1960 FCA (emphasis added). The 1960 FCA goes on to specify a strict operating schedule, such as "the outflow from Cochiti Reservoir during each spring flood and thereafter will be at the maximum rate of flow that can be carried . . . without causing flooding of areas protected by

levees or unreasonable damage to channel protective works . . . ." *Id.* Corps may not depart from the operating schedule except in certain limited emergencies or with the advice and consent of the Rio Grande Compact Commission. *See id.*

The 1960 FCA also squarely addresses fish and wildlife concerns: Corps may establish "permanent pools for recreation and fish and wildlife propagation," but the water to fill those pools must be "obtained from sources entirely outside the drainage basin of the Rio Grande." *See id.* In the 1964 FCA, Congress authorized Reclamation to send San Juan-Chama water to fill and maintain the permanent pool. *See* 1964 FCA.

Corps's position, then, is that the FCAs entirely stifle its ability to deviate in its operations: it is directed to only consider flood and sediment control; Congress explicitly provided a way to deal with environmental issues in the statutes; and Corps's operations must follow a strict schedule, with deviations permitted only in limited situations outside its control. Under these conditions, and keeping in mind that all four dams must be operated in a coordinated manner, and that Corps cannot upset the fragile equilibrium of water rights protected by various contracts and the Rio Grande Compact, Corps believes it does not have sufficient discretion to necessitate § 7(a)(2) consultation. This conclusion is bolstered by the Supreme Court's ruling in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007).

In *Home Builders*, the Supreme Court grappled with how to reconcile the Clean Water Act with the ESA. *See id.* at 649. While § 402(b) of the Clean Water Act *requires* the Environmental Protection Agency (EPA) to "transfer certain permitting powers to state authorities upon an application and a showing that nine specified criteria have been met," § 7(a)(2) of the ESA appeared to add an additional requirement of consulting with the designated federal agency prior to taking an action that could jeopardize any endangered species or its

habitat. *See id. Home Builders* noted that § 402(b) "operated as a ceiling as well as a floor"—the ceiling is the fact that the EPA may only consider nine specified criteria, and the floor is the fact that the EPA may not consider fewer criteria than the nine listed. *See id.* at 646. Adding the later-enacted § 7(a)(2)'s consultation requirement would "raise the floor" and "effectively repeal § 402(b)'s statutory mandate by engrafting a tenth criterion onto the [Clean Water Act]." *Id.* at 646, 663.

Refusing to find such an implicit repeal and modification without "clear and manifest" legislative intent, *Home Builders* approved regulation 50 C.F.R. § 402.03, which makes the ESA applicable only to agency actions that result from agency discretion. *Id.* at 665. Since § 402(b) required the EPA to transfer permitting power when nine enumerated criteria were satisfied, the EPA had no discretion to "add another entirely separate prerequisite to that list," so the EPA was not required to consult under § 7(a)(2). *See id.* at 671.

Likewise, here the later-enacted ESA cannot implicitly repeal and modify the 1960 FCA. For example, § 203(b) of the 1960 FCA sets a ceiling and a floor for the amount of water Galisteo and Jemez Canyon Dams can release during certain months:

> Releases of water from Galisteo Reservoir and Jemez Canyon Reservoir during the months of July, August, September, and October, will be limited to the amounts necessary to provide adequate capacity for control of subsequent summer floods; and such releases when made in these months, or thereafter, will be at the maximum rate practicable under the conditions at the time.

1960 FCA § 203(b). This means that from July through October, Corps cannot release more water than necessary to control summer floods—a ceiling—and Corps cannot release less water than the maximum rate practicable—a floor. Corps basically has no discretion on water release at Galisteo and Jemez Canyon during those months. The ESA cannot implicitly raise the FCA's ceiling by forcing Corps to release more water than the amount necessary to control summer

floods, just as the ESA cannot lower the floor by forcing Corps to release less than the maximum amount of water practicable under the conditions at the time.

As another example, the 1960 FCA mandates that Corps pass Cochiti Reservoir water downstream during each spring flood at the "maximum rate of flow that can be carried at the time . . . without causing flooding of areas protected by levees or unreasonable damage to channel protective works." *See* 1960 FCA § 203(a). This, too, means Corps has no discretion on how much water to release: it cannot release less water than the maximum rate of flow that can be carried at the time—the floor—and it cannot release so much water that it causes impermissible flooding or damage—the ceiling. The ESA cannot implicitly rewrite this provision by either allowing Corps to release less water than the maximum rate of flow, or allowing Corps to release so much water that prohibited consequences occur.

A few more examples: the 1960 FCA tells Corps that it may run its Middle Rio Grande operations "*solely* for flood control and sediment control." *See* 1960 FCA § 203 (emphasis added). The ESA cannot implicitly delete the word "solely" and rewrite the provision to allow Corps to operate for flood control, sediment control, *and* fish and wildlife development. And while the 1960 FCA allows for deviations from the operating schedule, the enumerated permissible deviations—with the consent of the Rio Grande Compact Commission and in case of emergency—have nothing to do with the environment. *See id.* The ESA cannot implicitly repeal and rewrite the 1960 FCA to add another reason to deviate from the strict operating schedule.

It appears that *Home Builders* is directly on point, and Guardians does nothing to convince the Court otherwise. Rather than discussing ceilings, floors, or implicit modification of existing law, Guardians only attempts to distinguish *Home Builders* by offering an unhelpful, circular assertion:

> In [*Home Builders*], the substantive statute at issue divested the U.S.
> Environmental Protection Agency of *all* discretionary authority. In this case on
> the other hand, as explained in Guardians' Opening Brief and in this Reply Brief,
> the Corps does have discretionary authority to modify its MRG Project operations
> for the benefit of the minnow and flycatcher. Accordingly, those aspects of the
> [*Home Builder*] decision which deal with circumstances where agencies have no
> statutory discretion whatsoever are not applicable here.

(Doc. 126 at 26.) Essentially, Guardians assures the Court that *Home Builders* is distinguishable because Corps has discretion, and Corps has discretion because *Home Builders* is distinguishable. Not compelling.

Far from being arbitrary or capricious, the parts of the 2014 Reassessment that analyze the 1960 FCA are substantively persuasive. Though the Court found at the motion-to-dismiss stage that Corps "retains some flexibility in its reservoir operations in the Middle Rio Grande," (Doc. 69 at 12), this conclusion was made while giving Guardians the benefit of the doubt at a macro-level, without diving into the specifics of the statutes or Corps's interpretations. Upon closer review, the Court finds that insisting on § 7(a)(2) consultation for Corps's flood control, carryover storage release, pass-through operations (including necessary adjustments to Abiquiu and Cochiti outlet gates), emergency operations, or determination of channel capacity would allow § 7(a)(2) to implicitly repeal and rewrite the 1960 FCA.

## 2. Creation and maintenance of pools at Abiquiu and Cochiti (Reassessment action numbers 7 and 8).

Regarding Abiquiu, Congress allowed Corps to contract with parties who have San Juan-Chama water rights—pursuant to the San Juan-Chama Act—for storage of up to 200,000 ac-ft of that water in Abiquiu Reservoir. *See* P.L. 97-140. Reclamation releases the San Juan-Chama water to Corps for storage. *See id.* Parties with rights to San Juan-Chama water who contract with the Corps for storage may demand that Corps release their water to them at any time. (2014 Reassessment at 26.)

Given the above, Corps believes it has insufficient discretion in the storage and release of San Juan-Chama water at Abiquiu Dam to require § 7(a)(2) consultation, and the Court agrees. Corps is merely holding water for people with rights to that water, and Corps must release that water on demand pursuant to its contracts. To say that Corps has discretion to store or release San Juan-Chama water at Abiquiu for environmental purposes would be to implicitly modify and repeal the San Juan-Chama Act or P.L. 97-140, in contravention of *Home Builders*.

Regarding Cochiti Dam, the 1960 and 1964 FCAs authorized a permanent pool of 1,200 acres for "conservation and development of fish and wildlife resources and for recreation." *See* 1960 FCA § 203(e); 1964 FCA. The 1964 FCA authorizes the Secretary of the Interior to use San Juan-Chama water to fill the pool, with the addition of "sufficient water annually to offset the evaporation." *See* 1964 FCA. Guardians has not claimed that the pool is discretionary, and, given the 1960 and 1964 FCAs, the Court believes Corps is right in saying that the only action subject to consultation is the delivery of San Juan-Chama water to replenish Cochiti after evaporation—an action for which Reclamation is already consulting with FWS.

**IV. The remainder of the 2014 Reassessment.**

### a. Sediment Retention (Reassessment action number 13).

Corps identified sediment retention as an incidental effect of its dam operations and its maintenance of the permanent pools at Abiquiu and Cochiti. (2014 Reassessment at 31.) Guardians does not challenge this factual assertion. Since, as explained above, Corps's dam operations are not discretionary, nor are its duties to maintain pools at Abiquiu and Cochiti, Corps is not arbitrary or capricious in deciding that it does not need to consult about incidental effects of those non-discretionary actions.

**b. Inter-agency coordination (Reassessment action number 11).**

Corps notes that the water management agencies in the Rio Grande communicate and coordinate with each other. (*Id.* at 29.) This communication, Corps points out, is just a necessary result of having multiple agencies regulate water in the same geographic area. To require consultation over communication, Corps adds, would cause even the "mere scheduling of a meeting among agencies [to] require consultation." (*See id.*) Corps is reasonable, not arbitrary or capricious, in believing that the referenced coordination and communication does not trigger consultation.

**c. Non-Corps actions.**

   1. Hydroelectric power (Reassessment action number 10).

Corps says that the County of Los Alamos constructed, operates, and maintains a run-of-the-river hydroelectric power facility. (*Id.* at 28.) Corps claims that it does not release any water specifically for the benefit of the power plant, and that the facility does not impact reservoir storage or releases. (*Id.*) Accepting Corps's unchallenged factual assertions, the Court finds that Corps is not arbitrary or capricious in believing that there is no Corps action to require consultation.

   2. Flow reduction to install and remove irrigation outlet gates at Cochiti Dam (Reassessment action number 6).

Corps says that it had decreased the release at Cochiti Dam to assist the installation and removal of fish screens and bulkhead gates at a stilling basin below Cochiti. (*Id.* at 21.) However, during its reassessment, Corps discovered a June 1967 Memorandum of Agreement between Reclamation, the MRGCD, and Corps that identifies Reclamation or the MRGCD as the party responsible for maintenance and operation of the outlet gates. (*See id.* (citing A.R. 000101).) As such, Corps concluded that either Reclamation or the MRGCD is responsible for

consultation over any necessary flow reduction. After reviewing the referenced memorandum, the Court finds that Corps reasonably believes there is no Corps action here to necessitate § 7(a)(2) consultation.

### d. Maintenance (Reassessment action numbers 4 and 5).

Citing an internal memorandum, Corps explains its view that it has an inherent, non-discretionary responsibility to maintain civil works structures authorized by Congress. (*Id.* at 19.) Part of its maintenance operations includes inspecting Abiquiu Dam tunnel and clearing accumulated sediment in the Jemez Canyon Dam stilling basin. (*Id.* at 19–20.) Corps believes that since there is no discretion in whether to maintain these structures, there is no need to consult over their maintenance. Guardians has not challenged the internal memorandum, and the Court finds Corps's reasoning to be reasonable—if Congress authorizes an agency to operate a structure, then absent any other guidance, a reasonable presumption is that the agency should maintain the structure as well.

Though maintenance may not be discretionary, there is discretion in how to conduct maintenance. (*Id.* at 19.) If the *manner* in which maintenance is conducted may affect endangered species or their critical habitats, consultation over the manner of maintenance is necessary. (*Id.*) The 2014 Reassessment recommended that Corps verify or reevaluate the effects of its maintenance operations to ensure that there is no effect on endangered species or their critical habitats. (*See id.* at 19–20.)

It is unclear whether Corps is consulting over its maintenance operations, and, if not, whether Corps has verified the effects of such operations, as the 2014 Reassessment suggested. Thus, on maintenance operations, the Court will withhold judgment and remand to Corps for

explanation. *See Home Builders*, 551 U.S. at 657 (explaining that the proper course of action upon a finding of arbitrariness or capriciousness is to remand to the agency for explanation).

## V. Corps does not need to consult on hypothetical actions.

Section 7(a)(2) consultation duties only apply to agency "actions." *See* 16 U.S.C. § 1536. Guardians takes a broad view of "action," arguing that because Corps engages in operations, generally, in the Middle Rio Grande, Corps triggers § 7(a)(2). (*See* Doc. 126 at 20.) Corps takes a more narrow view of action, arguing that only affirmative actions count for § 7(a)(2). (*See* Doc. 124 at 20–21.)

*WildEarth Guardians v. United States EPA*, 759 F.3d 1196 (10th Cir. 2014) defines what counts as an "action" that triggers § 7(a)(2). In *Guardians*, the EPA introduced a plan to regulate emissions from a power plant in New Mexico. *Id.* at 1198. Guardians argued that the EPA had to consult with FWS because the EPA's plan did not cover the emission of mercury and selenium, which Guardians alleged the EPA had the power to regulate. *See id.* at 1207. The *Guardians* Court assumed that the EPA did have power to regulate mercury and selenium, but the Court found that choosing not to exercise a power does not constitute an "action" that triggers § 7(a)(2). So only affirmative actions, not actions that an agency declines to take, trigger § 7(a)(2) duties.

The 2014 Reassessment revealed, and the Court noted at the motion-to-dismiss stage, that Corps's Middle Rio Grande operations include many affirmative actions. (Doc. 69 at 10–11.) Guardians is free to argue that Corps has discretion over those actions. Guardians may not, however, lump all of Corps's actions together as "operation of [the Middle Rio Grande] Project" and then claim that because Corps has the ability to take unspecified actions, Corps must consult. (*See* Doc. 126 at 20.) Apart from a vagueness problem, Guardians's approach also conflates action and discretion. One corollary of the Tenth Circuit's *Guardians* decision is that action

comes before discretion: The analysis begins with an examination of whether there is an affirmative action. If so, then the parties analyze whether an agency has discretion over that action. If an agency has discretion to take an action but refrains from doing so, that does not count as both action and discretion under § 7(a)(2). Otherwise, the *Guardians* Court would have made the EPA consult.

Corps is thus correct on its decision not to consult about the storage of Rio Grande water in Abiquiu (Reassessment action number 9). As explained above, Corps may store up to 200,000 ac-ft of Rio Grande water at Abiquiu, to the extent that contracting parties no longer require Corps to store San Juan-Chama water there. *See* P.L. 100-522. Since Corps currently only stores about 180,000 ac-ft of San Juan-Chama water at Abiquiu, Corps could still store about 20,000 ac-ft of Rio Grande water. But Corps has no plans to store Rio Grande water in Abiquiu, (*see* 2014 Reassessment at 28), and under *Guardians*, Corps cannot be forced to consult on its discretionary decision not to take an action.

## VI. Guardians is not persuasive in arguing that Corps's decision on discretion is otherwise arbitrary or capricious.

Guardians advances six arguments to support its contention that Corps's decision on its discretion in the Middle Rio Grande is arbitrary or capricious. None of them are persuasive.

### (1) The plain language of the 1948 and 1960 FCAs do not "make clear" that Congress authorized Corps to conduct Middle Rio Grande operations for the benefit of the minnow and flycatcher.

Guardians contends that the "plain language" of the 1948 and 1960 FCAs "makes clear" that Congress authorized Corps to conduct operations for the benefit of the minnow and flycatcher. (Doc. 120 at 48.) This contention is based on three premises: (1) Corps originally wrote in a report to Congress that authorized purposes of the Middle Rio Grande Project should include "fish and wildlife development," (2) Congress relied on Corps's report in authorizing the

Middle Rio Grande Project in the 1948 and 1960 FCAs, and (3) in the FCAs, Congress said that Corps could deviate from the operating schedule with the consent of the Rio Grande Compact Commission. (*See id.* at 20–28.)

Unfortunately for Guardians—and despite its reference to the "plain language" of statutory text—the meat of its argument has little to do with the language of the 1948 and 1960 FCAs. The 1948 FCA says that except with the consent of the Rio Grande Compact Commission, "*all* reservoirs constructed as a part of the project *shall* be operated *solely* for flood control . . . ." *See* 1948 FCA (emphasis added). Though Congress passed the 1948 FCA to approve Corps's report, the approval was limited to the extent the 1948 FCA comported with the report. Any part of Corps's report that was inconsistent with the FCA was not approved. *See id.*

Over a decade later, Congress in the 1960 FCA added sediment control—not fish and wildlife development—to the authorized purposes, saying the Middle Rio Grande facilities "will be operated *solely* for flood control and sediment control . . . ." 1960 FCA § 203 (emphasis added). And to leave no doubt that it had considered the issue, Congress in the 1960 FCA also expressly addresses fish and wildlife development, saying that Corps may create permanent pools with non-native water.

To the extent Guardians believes that Corps has discretion in its operations because it may deviate from the operating schedule with the permission of the Rio Grande Compact Commission, that belief is misguided. Taking Guardians's argument to its logical conclusion would mean that every agency has "discretion" to take any constitutional action. After all, any agency could take any constitutional action if it just secured permission from Congress. The EPA in *Home Builders* could have, with Congressional approval, added a tenth criterion before transferring permitting power to Arizona. Should it have undertaken § 7(a)(2) consultation? This

is not a case where a federal agency was granted unilateral discretion by statute, but chose to contract away that discretion to skirt § 7(a)(2) duties. Here, it was Congress that took away Corps's discretion by requiring Corps to seek permission before making any deviation.

Simply put, the words of the 1948 and 1960 FCAs do not convince the Court that Corps's decision on its discretion is arbitrary or capricious.

### (2) The Fish and Wildlife Coordination Act of 1958 and the 1986, 1990, and 1996 Water Resources Development Acts do not show that Corps's decision about its discretion over its operations is arbitrary or capricious.

Guardians posits that the Fish and Wildlife Coordination Act of 1958 (FWCA), 16 U.S.C. § 662, and the 1986, 1990, and 1996 Water Resources Development Acts (WRDAs), 33 U.S.C. §§ 2294, 2316, and 2330(a), authorize Corps to deviate for the benefit of the minnow and flycatcher. (*See* Doc. 120 at 7–9.) While the FWCA and the WRDAs do enable Corps to study and implement modifications that may benefit fish and wildlife, there is a caveat that any changes should not conflict with original project purposes:

> Federal agencies authorized to construct or operate water-control projects are authorized to modify or add to the structures and operations of such projects . . . *provided*, That for projects authorized by a specific Act of Congress before the date of enactment of the [FWCA] (1) such modification or land acquisition shall be compatible with the purposes for which the project was authorized . . . .

16 U.S.C. § 662(c).

Corps takes the position that deviating from the "statutorily-prescribed operations" would "undermine the carefully-crafted provisions of the 1960 FCA . . . ." (Doc. 124 at 28.) This is a sensible position since there are many provisions in the 1960 FCA that operate both as a ceiling and a floor. Given the caveat that agencies not take actions that conflict with authorized project purposes, Corps reasonably believes it has no discretion over its Middle Rio Grande operations.

Furthermore, "[i]t is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)

(citation omitted). This general-specific canon is "particularly true where . . . 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *See id.* (citation omitted). Congress in the 1960 FCA enacted a comprehensive scheme to control Middle Rio Grande operations, and Congress has squarely addressed the issue of fish and wildlife development within the scheme. To the extent there are contradictions between the FWCA, the WRDAs, and the 1960 FCA as to how operations should be run, the 1960 FCA controls unless Guardians can point to "textual indications that point in the other direction." *See id.* at 646–47. Though Guardians claims that Congress's "specific purpose" in passing the FWCA and WRDAs was to supplement existing laws that were environmentally lacking, (*see* Doc. 126 at 17), Guardians fails to sufficiently support this assertion and convince the Court that the FWCA and WRDAs were supposed to override any conflicting legislation.

And Guardians's argument that applying the general-specific canon would lead to an "irrational result," (*see id.* at 18), betrays its misunderstanding of Corps's argument. Corps is not arguing that because there is some specific purpose animating water control projects, the FWCA and WRDAs should never apply. Rather, Corps is arguing that the 1960 FCA by its terms leaves no room for the application of the FWCA and WRDAs, and the 1960 FCA deliberately articulated its own way of dealing with environmental issues. In this instance, the specific provisions governing the specific operation in the specific geographic area controls over conflicting statutes of general applicability.

The FWCA and WRDAs do not convince the Court that Corps was arbitrary or capricious in deciding that it has insufficient discretion over its Middle Rio Grande operations to require § 7(a)(2) consulting.

**(3) The caselaw does not show that Corps's decision on its discretion is arbitrary or capricious.**

Guardians asserts that "courts have routinely construed Corps'[s] discretionary authorities to include the authority to modify project operations . . . so long as the modified operations are not inimical to pursuit of the originally enumerated project purposes." (Doc. 120 at 48.) But Corps reasonably believes that modifying its operations for the benefit of the minnow and flycatcher *would* be inimical to original project purposes. Additionally, the cases Guardians cites are neither binding nor on point.

Many cases Guardians cites are inapposite simply because they deal with a different flood control project, governed by different statutory rules. *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535 (11th Cir. 2013) held that Corps is permitted to deviate for fish and wildlife purposes when administering the Central and Southern Florida Project for Flood Control in the Everglades. *Id.* at 536. But one of the authorized purposes for the Everglades project is "maintaining fish, wildlife, and marsh vegetation," *id.* at 541 n.9, whereas here, the only authorized purposes are flood and sediment control. And Corps is permitted in the Everglades project to "modify the schedule for delivery of water," *see id.* at 541 n.8, whereas here, Corps is constrained by a detailed operating schedule set by Congress.

Further, Guardians contends that *In re: Operation of the Missouri River System*, 363 F. Supp. 2d 1145 (D. Minn. 2004), *American Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 230 (D.D.C. 2003), and *Missouri v. Dep't of the Army*, 526 F. Supp. 660 (W.D. Mo. 1980) demonstrate that Corps has ample discretion to implement changes to operations for environmental purposes. But those cases involved a different Flood Control Act, the Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 887 (1944) (the "1944 FCA"), which authorized Corps to consider "other purposes" in addition to navigation and flood control. *See S.*

*Dakota v. Ubbelohde*, 330 F.3d 1014, 1020 (8th Cir. 2003) (explaining that the 1944 FCA recognizes secondary purposes like fish and wildlife propagation). In contrast, the FCAs dealing with Middle Rio Grande operations explicitly say that only flood and sediment control are authorized purposes.

Other cases Guardians relies on do not deal with the question at issue. Guardians cites *Raymond Proffitt Found. v. U.S. Army Corps of Engineers*, 343 F.3d 199 (3d Cir. 2003) and *Raymond Proffitt Found. v. U.S. Army Corps of Engineers*, 128 F. Supp. 2d 762 (E.D. Pa. 2000) for the proposition that the 1990 WRDA gives Corps an affirmative duty "to include environmental protection as a mission." (Doc. 120 at 10.) Be that as it may, neither *Raymond Proffitt* case addresses the question of what happens when the 1990 WRDA conflicts with a specific Flood Control Act.

Guardians invokes *Missouri v. Dep't of the Army*, *Britt v. U.S. Army Corps of Engineers*, 769 F.2d 84 (2nd Cir. 1980), and *Creppel v. U.S. Army Corps of Engineers*, 670 F.2d 564 (5th Cir. 1982) to argue that Corps has discretion to deviate because Congress expects Corps to deviate from Flood Control Acts in response to changed circumstances. (*See* Doc. 120 at 11–12.) As Guardians admits, however, any deviation must accord with the purposes of the underlying flood control project. (*See* Doc. 120 at 48.) The Middle Rio Grande Project is unique in that even small changes could upset the fragile equilibrium over water use established by the Rio Grande Compact, various contracts, and statutes. With this situation in mind, Congress deliberately specified the *sole* purposes of the project and implemented a strict operating schedule. Despite Guardians's framing that deviation for environmental purposes is just a commonsense agency

response to changed circumstances, Corps reasonably believes that unilateral deviations for environmental purposes would be disruptive to the objectives of the 1960 FCA.[5]

**(4) Corps's regulations do not make Corps's decision arbitrary or capricious.**

Guardians argues that Corps's regulations reveal that it has "blanket authorization" to add new project purposes for the benefit of endangered species. (Doc. 120 at 48.) But Corps's regulations unambiguously limit environmental deviations to instances when such deviations comport with the authorized purposes of the specific Flood Control Act:

> Revisions and updates [to the water control plans for a Corps facility] may incorporate upstream and downstream environmental flow objectives *when compatible in accordance with authorization and approved purposes*.

Dep't of the Army, U.S. Army Corps of Eng'rs, Eng'r Regulation No. 1110-2-240, Engineering and Design—Water Control Management (May 30, 2016), ¶ 3-2(g) (emphasis added). As mentioned, Corps sensibly believes that it may not deviate from its Middle Rio Grande operating schedule for environmental purposes given the provisions of the 1960 FCA.

Even if the Court were to manufacture ambiguity by selectively reading the regulation—perhaps by interpreting ¶ 1-5(a) of the regulation to mean that "fish and wildlife conservation" is an "authorized purpose"—any ambiguity is to be resolved in favor of Corps's permissible reading of its own regulation. *See Auer v. Robbins*, 519 U.S. 452, 457 (1997) (citation omitted). Here, the regulation applies *generally* to all reservoir projects that Corps owns and operates in the United States. Not all of these reservoirs are subject to the same battles over water that afflict the Middle Rio Grande facilities, and not all of these reservoirs are subject to the stringent "solely for flood control and sediment control" exhortation. In light of these facts, language in

---

[5] As an aside, Guardians uses *Britt* to argue that Corps's reports "that form the basis for Congressional authorization are 'never intended to be the final plans for the project.'" (*See* Doc. 120 at 11 (citing *Britt*, 769 F.2d at 89).) But that point cuts against Guardians's earlier argument that because Corps included fish and wildlife development as a purpose in its original report to Congress regarding the Middle Rio Grande Project, Congress intended fish and wildlife development to be a purpose of the project.

the regulation that suggests fish and wildlife conservation is an authorized purpose is no more than an acknowledgment of the fact that at some—but not all—facilities, fish and wildlife conservation is an authorized purpose. If the regulation actually constituted "blanket authorization" to modify operations for fish and wildlife conservation at every single facility, then language like "when compatible in accordance with authorization and approved purposes" from ¶ 3-2(g) would be superfluous.

### (5) Corps's prior actions do not render its current decision on discretion arbitrary or capricious.

Guardians avers that Corps's previous actions, like consulting with FWS and deviating from planned operations for the benefit of the minnow and flycatcher, show that Corps's current discretion opinion is arbitrary or capricious. (*See* Doc. 120 at 34–37, 49.) There is a difference, however, between what Corps is *supposed* to do and what it *can* do. Just because Corps did something in the past does not make it legal. For some actions, Corps acknowledges that it consulted in the past, but explains that pursuant to its 2014 Reassessment, it now believes it has no legal discretion to deviate from planned operations. For other actions, Corps explains that it consulted with FWS because it was jointly consulting with Reclamation and did not seriously examine which actions actually constituted Corps actions. After headquarters issued guidance telling Corps to more closely scrutinize its ESA obligations, Corps changed course. The Court sees no evidence of arbitrary or capricious behavior—indeed, agencies are entitled to change their minds as long as they follow proper procedures. *See Home Builders*, 551 U.S. at 658–59.

Nor do Corps's previous deviations constrain Corps to consult with FWS. Previous deviations were only permissible either with special Congressional authority or with the consent of the Rio Grande Compact Commission. (*See* Doc. 124 at 34–35.) The Congressional authority has since expired. (*Id.* at 35.) And the Court has explained that "discretion" that comes only with

the consent of another body is not the requisite discretion that mandates § 7(a)(2) consultation when Congress imposes the consent requirement.

### (6) The minnow riders and subsequent Congressional enactments do not constitute endorsement of the idea that Corps has discretion over its Middle Rio Grande operations.

Congress enacted a series of laws regulating water in the Middle Rio Grande, including the Energy and Water Development Appropriations Act, 2004, Pub. L. No. 108-137, § 208, 117 Stat. 1827, 1849–50 (2003) (the "2003 minnow rider"), the Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, § 205, 118 Stat. 2809, 2949 (2004) (the "2004 minnow rider"), and the Energy and Water Development Appropriations Act, 2006, Pub. L. No. 109-103, § 121(b), 119 Stat. 2247, 2256 (2005) (the "2005 minnow rider"). Guardians argues that these minnow riders constitute Congressional endorsement of the idea that Corps has discretion over its Middle Rio Grande operations. (*See* Doc. 120 at 38–41.) But the text of the minnow riders belies Guardians's claim:

> Notwithstanding any other provision of law, the Secretary of the Interior, acting through the Commissioner of the Bureau of Reclamation . . . may not use discretion, *if any*, to restrict, reduce, or reallocate any water stored in Heron Reservoir or delivered pursuant to San Juan-Chama Project contracts, including execution of said contracts facilitated by the Middle Rio Grande Project, to meet the requirements of the Endangered Species Act.

2003 minnow rider (emphasis added). The above quoted 2003 minnow rider was the result of joint consultation with FWS by Reclamation and Corps. The "may not use discretion, *if any*" language demonstrates that Congress does not endorse the idea that Reclamation (or Corps) has discretion to deviate from statutorily-mandated operations. *See id.* (emphasis added). The "if any" language remains in the subsequent minnow riders. *See* 2004 and 2005 minnow riders.

Guardians next points to language in the 2005 minnow rider that provides "[t]he Secretary of the Army may carry out and fund projects to comply with the 2003 Biological

Opinion . . . ." (Doc. 120 at 40.) Guardians also throws in the Water Resources Development Act of 2007, which commands, "The Secretary shall select and shall carry out restoration projects in the Middle Rio Grande from Cochiti Dam to the headwaters of the Elephant Butte Reservoir in the State of New Mexico." (*Id.* (citing Pub. L. No. 110-114, § 3118(b), 121 Stat. 1041, 1137 (2007) (the "2007 WRDA")).)

Neither provision Guardians highlights is persuasive. The 2003 Biological Opinion has expired, and the 2007 WRDA also carries the same caveat as the FWDA and other WRDAs. In particular, the 2007 WRDA clarifies that a "restoration project" is one that is "consistent with other Federal programs, projects, and activities." 2007 WRDA § 3118(a). As explained, Corps reasonably believes that adding additional projects would be inconsistent with its Middle Rio Grande operations because such projects would clash with authorizing Flood Control Acts and disrupt the delicate balance of water rights in the region.

## CONCLUSION

For the reasons given, the Court withholds final judgment on the maintenance activities in the Abiquiu Dam tunnel and the Jemez Canyon Dam stilling basin and **remands** to Corps for clarification on those activities. The Court **denies** the remainder of Guardians's motion.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**